|   | UNITED STATES DISTRICT COURT<br>DISTRICT OF PUERTO RICO |   |
|---|---|---|
| JESÚS ORTIZ-GARCÍA, et al.,<br><br>     Plaintiffs,<br><br>     v.<br><br>MIGUEL PEREIRA-CASTILLO, et al.,<br><br>     Defendants. | | Civil No. 07-2004 (JAF) |

**OPINION AND ORDER**

Plaintiffs, Jesús Ortiz-García and Elsie Lima-Tartabú, bring the present action under 42 U.S.C. § 1983, both personally and on behalf of their deceased son, Jesús Ortiz-Lima ("Decedent"), against Defendants, Miguel A. Pereira-Castillo ("Pereira"), Héctor Fontánez-Rivera ("Fontánez") and his conjugal partnership with Lydia Ivette Lasalle, Ramón L. Díaz-Correa ("Díaz") and his conjugal partnership with his unnamed spouse, Roberto del Valle-Navarro ("del Valle") and his conjugal partnership with his unnamed spouse, José A. Sánchez-Acevedo ("Sánchez") and his conjugal partnership with his unnamed spouse, Gilberto Negrón-Falcón ("Negrón") and his conjugal partnership with his unnamed spouse, Rafael López-Colón ("López") and his conjugal partnership with his unnamed spouse, David Águila-Rodríguez ("Águila") and his conjugal partnership with his unnamed spouse, Ángel C. Medina ("Medina") and his conjugal partnership with his unnamed spouse, Hiram Peña and his conjugal partnership with his

Civil No. 07-2004 (JAF)                                                     -2-

unnamed spouse,[1] and Myrna Rivera and her conjugal partnership with her unnamed spouse,[2] in their personal capacities, alleging violations of Decedent's rights under the U.S. Constitution. (Docket No. 23.) Plaintiffs also allege violations of their and Decedent's rights under Puerto Rico law. (Id.) Pereira, Fontánez, Díaz, del Valle, Sánchez, Negrón, López, Águila, and Medina (together, "Movants") move for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) (Docket No. 64), and Plaintiffs oppose (Docket No. 72).

## I.

## Factual and Procedural History

We derive the following factual and procedural summary from the parties' pleadings, motions, exhibits, and statements of uncontested facts. (Docket Nos. 11; 23; 45; 58; 64; 68; 72; 73;[3] 77; 79; 81.)

**A.   Movants**

During the time period relevant to this case, Movants were all officials of the Administration of Corrections ("AOC"). The AOC operates correctional facilities like the one at issue in this case,

---

[1] Hiram Peña has been voluntarily dismissed without prejudice. (Docket No. 51.)

[2] Myrna Rivera has not appeared in this case, though she was served with process on June 11, 2008. (See Docket No. 49.)

[3] Movants did not controvert Plaintiffs' proffered facts (Docket No. 73 at 11-16), which are, therefore, deemed admitted under Local Civil Rule 56(e).

the now-closed Institution 352 of Río Piedras ("Río Piedras 352"). (Docket Nos. 73-22; 77-7.)

Pereira was secretary of the AOC. (Docket No. 68-28.) His testimony reveals that he was actively involved in monitoring and prioritizing security measures taken at Río Piedras 352. (See, e.g., Docket No. 73-22 at 10-11.) He also received reports from subordinates regarding the conditions there. (Id. at 2; see also Docket No. 68-8 at 6.)

Fontánez was assistant secretary of security in the AOC. (Docket No. 77-6.) His testimony reveals that he had specific knowledge of, and gave instructions regarding, the conditions of security at Río Piedras 352. (See Docket No. 79-4 at 3-4.) Other AOC officials reported to him regarding security incidents at Río Piedras 352. (See Docket No. 77-6 at 2.) Further, he headed the office in charge of preparing the master roster (Docket No. 68-2 at 2), which assigned guards to specified posts within Río Piedras 352 (Docket No. 77-3 at 15-16).

Díaz was director of the East Region for the AOC. (Docket No. 68-2.) His testimony reveals that he made decisions regarding security expenditures, and otherwise handled security deficiencies, at Río Piedras 352. (See, e.g., Docket No. 73-19 at 3, 11.)

Del Valle was superintendent of Río Piedras 352. (Docket No. 68-14.) He received reports from other officials regarding security incidents at Río Piedras 352. (Docket No. 68-14 at 7.) He was also

Civil No. 07-2004 (JAF)                                                     -4-

charged with identifying and reporting to his superiors the security conditions at Río Piedras 352. (Docket No. 77-14 at 10.)

Sánchez was commander of the guard at Río Piedras 352. (Docket No. 77-10.) His testimony reveals that he was charged with notifying his superiors of security conditions and with implementing security measures at Río Piedras 352. (Docket No. 73-3 at 2, 11-12.) He also assigned correctional officers to their shifts and monitored the rosters used at Río Piedras 352. (Docket No. 77-11 at 1, 13)

Negrón was security advisor to Díaz. (Docket No. 68-31.) He inspected Río Piedras 352 and made recommendations to Díaz regarding security conditions there. (Docket No. 68-8 at 1, 5-6.) Fontánez considered Negrón the "chief of security" at Río Piedras 352. (Docket No. 79-4 at 4.)

López was sub-commander of the guard of Río Piedras 352. (Docket No. 68-19.) He ensured officers' compliance with security regulations and reported on security conditions at Río Piedras 352. (Id.)

Águila was a supervisor of the correctional officers at Río Piedras 352. (Docket No. 68-7.) He ensured officers' compliance with security regulations and implemented security conditions at Río Piedras 352. (Docket Nos. 68-7 at 1; 73-15 at 12.) He was the on-duty supervisor at the time of Decedent's death. (Docket No. 68-7 at 6.)

Medina was a correctional officer at Río Piedras 352. (Docket No. 68-27.) He stood guard in assigned posts at Río Piedras 352.

(Id.) He was the on-duty guard in Decedent's living quarters at the time of Decedent's death. (Docket No. 68-29.)

**B.   Conditions of Decedent's Confinement and Death**

On October 28, 2006, the date of his death, Decedent was in the penal custody of the AOC at Río Piedras 352. (Docket No. 77-7.) At that time, Río Piedras 352 housed 448 medium-security, minimum-security, and protective-custody inmates. (Docket Nos. 68-7 at 3; 77-11 at 4.) Decedent was assigned to Section B, the medium-security section of the facility, which housed approximately 174 inmates. (Docket Nos. 68-7 at 3; 73-9 at 7; 77-7.)

At that time, Río Piedras 352 suffered from various security deficiencies, as did other institutions under AOC's control. (E.g. Docket No. 73-22.) For example, inside the living quarters, the locks on the cell doors did not function (e.g. Docket No. 73-15); had they been working, they would have separated Decedent from three of the four inmates convicted for his murder (see Docket Nos. 73-9 at 7; 73-15 at 1-2; 73-17; 77-4 at 9-11). The prison was understaffed (e.g. Docket Nos. 73-20 at 4; 77-14 at 2); for example, whereas security analyses prescribed two fixed posts inside Decedent's living quarters (Docket No. 73-3 at 15),[4] only one guard was stationed there at the time of Decedent's death (Docket Nos. 73-3 at 7; 73-15 at 6). Guards routinely found shanks in inmates' possession (e.g. Docket No. 68-7

---

[4] A "fixed post" is one that must be occupied by a guard at all times. (Docket No. 68-7 at 5.)

Civil No. 07-2004 (JAF)                                           -6-

at 2),[5] and there was a history of violence among the inmates (e.g. Docket No. 73-20 at 5-7).

While prison officials were aware of these conditions,[6] Río Piedras 352 was in the process of closing, and certain administrators had decided that no money would be spent on repairing the conditions there. (E.g. Docket Nos. 73-19; 73-22.) Instead, prison officials worked to maintain order, performing routine searches (see Docket No. 68-7 at 1-4) and attempting to keep the guard posts filled, sometimes by assigning guards to double shifts or by borrowing guards assigned to other institutions (see Docket Nos. 68-7 at 8-9; 73-20 at 7).

On the evening of Decedent's death, one guard, Medina, was on duty in the sole post assigned to Decedent's living quarters. (Docket No. 68-29.) His shift that day lasted from 2:00 until 10:00 p.m. (Id.) At 6:00 p.m., following routine practice, the prison officials closed down the living quarters for the night, which consisted of shutting the doors that separated the inmates housed along the lower level of the quarters from those, like Decedent,

---

[5] "Shanks" are makeshift knives, crafted by sharpening common items such as toothbrushes. (Docket No. 77-4 at 6.)

[6] Submitted testimony suggests that all Movants had specific knowledge of said conditions, namely Pereira (e.g. Docket No. 73-22 at 2), Fontánez (e.g. Docket No. 79-4 at 3), Díaz (e.g. id., Docket Nos. 73-19 at 11; 77-14 at 2), del Valle (e.g. Docket No. 79-4 at 5), Sánchez (e.g. Docket No. 73-3 at 1-2), Negrón (e.g. Docket Nos. 73-3 at 1-2; 79-4 at 4), López (e.g. Docket No. 68-19), Águila (e.g. Docket No. 68-7 at 11), and Medina (e.g. Docket No. 73-20 at 4).

residing in the upper, and performed a headcount of the inmates. (Docket Nos. 73-4 at 2; 73-5 at 1; 73-15 at 1.) While Medina was also supposed to make a preventative round every half hour (Docket No. 68-7 at 4, 10), testimony from one of the inmates suggests that the 6:00 p.m. headcount was the only round Medina made that evening (Docket No. 73-5 at 1).

According to Medina's testimony, guards' facilities, including the restroom and water fountain, were located outside the living quarters, in the control room. (Docket No. 73-6.) The control room was a glass-encased room connecting Section B, where Decedent was housed, to Section A, the minimum-security living quarters. (Docket No. 73-3 at 7-10.) One guard was assigned to the control room to watch over both sections and to control access to them. (Id. at 17-18.) While Medina was obliged to leave his post and enter the control room in order to use the guards' facilities, when he did so he was supposed to call by radio his on-duty supervisor, Águila, for a replacement guard. (See Docket No. 68-7 at 6, 13.) That evening, Medina instead called the control-room guard, asking that guard to watch over Section B for him while he used the water fountain. (Docket Nos. 68-27; 73-6.) The control-room guard remained inside the control room, however, leaving Decedent's living quarters without a guard. (Id.) It was then, at approximately 8:20 p.m., when four of Decedent's fellow inmates fatally stabbed him with shanks. (See id.)

Civil No. 07-2004 (JAF)                                                -8-

During or immediately after the stabbing, Medina noticed the commotion and then saw Decedent, wounded, walking along a corridor toward the control room. (Docket No. 73-6.) Medina then notified Águila of the emergency. (Id.) The officials arranged for an ambulance, which took Decedent to the hospital where he died. (See Docket Nos. 73-6; 77-4 at 3-4.)  The autopsy revealed the stab wounds as the cause of death. (Docket No. 79-2 at 12.)  Later, with the help of an informant inmate, the murder weapons were recovered, and four inmates were convicted for Decedent's murder. (See Docket No. 73-5.)

**C.   Procedural History**

On October 22, 2007, Plaintiffs filed suit in this court. (Docket No. 1.) On May 7, 2008, they filed an amended complaint. (Docket No. 23.) Movants moved for summary judgment on June 1, 2009 (Docket No. 64), and Plaintiffs responded on June 17, 2009 (Docket No. 72).

## II.

## Summary Judgment under Rule 56(c)

We grant a motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "genuine" if it could be resolved in favor of either party and "material" if it potentially affects the outcome of the case. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

The movant carries the burden of establishing that there is no genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In evaluating a motion for summary judgment, we view the record in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

"Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must 'produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue.'" Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (quoting Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)). The nonmovant "may not rely merely on allegations or denials in its own pleading; rather,

its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).

### III.

### Analysis

Movants argue that they are entitled to summary judgment because (1) Plaintiffs have failed to establish a cause of action under 42 U.S.C. § 1983 for violation of Decedent's Eighth and Fourteenth Amendment rights; and (2) Movants are entitled to qualified immunity. (Docket No. 64.) We address each argument in turn.

**A.   Prima-Facie Case under the Eighth and Fourteenth Amendments**

Section 1983 provides a civil remedy for violation of a federal right by a person acting under the color of state or territorial law.[7] 42 U.S.C. § 1983. In addition, under § 1983, a supervisory official may be held liable for his subordinates' behavior, but only if (1) his subordinates' behavior resulted in a constitutional violation; and (2) the official's action or inaction was affirmatively linked to that behavior such that "it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008)

---

[7] Movants argue that Sánchez was on vacation at the time of Decedent's death and, thus, was not acting "under color of state law" during the relevant time period. (Docket No. 64 at 15.) We find this argument wholly unpersuasive given that Plaintiffs allege Sánchez', and all other Defendants', ongoing involvement in creating and maintaining the conditions of Decedent's confinement.

(internal quotation marks omitted) (quoting Lipsett v. Univ. of P.R., 864 F.2d 881, 902 (1st Cir. 1988)).

Plaintiffs allege each Movants' direct violation both of Decedent's Eighth Amendment rights and of his substantive due process rights under the Fourteenth Amendment.[8] (Docket No. 23.) Plaintiffs also allege supervisory liability as to all Movants except Medina for said violations. (Id.) We discuss these allegations below.

### 1. **Eighth Amendment**

The Eighth Amendment prohibits "cruel and unusual punishment." U.S. Const. amend. VIII. Under it, prisoners have the right to humane conditions of confinement, which imposes on prison officials a duty to take "reasonable measures to guarantee the safety of the inmates." Giroux v. Somerset County, 178 F.3d 28, 31 (1st Cir. 1999) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994)). Specifically, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Id. (quoting Farmer, 511 U.S. at 833). But not all incidents of inmate-on-inmate violence give rise to official liability; a "prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if

---

[8] Plaintiffs also mention a Fifth Amendment claim in their complaint (Docket No. 23 at 10) but, based on the record, do not appear to pursue it. We merely note that because this case does not allege any action by the federal government, any such claim would be dismissed as a matter of law. See Martínez-Rivera v. Sánchez-Ramos, 498 F.3d 3, 8-9 (1st Cir. 2007) (upholding dismissal of Fifth Amendment claim given absence of federal government action).

he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847.

Accordingly, to hold an official personally liable in these circumstances, a plaintiff must show that the official was "deliberately indifferent" to a "substantial risk of serious harm." Burrell v. Hampshire County, 307 F.3d 1, 7-8 (1st Cir. 2002) (citing Farmer, 511 U.S. at 834). For conduct to be "deliberate," the official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (quoting Farmer, 511 U.S. at 837). Further, an official will not be found "indifferent" if he "responded reasonably to the risk, even if the harm ultimately was not avoided." Id. (citing Farmer, 511 U.S. at 844).

Movants argue that Plaintiffs cannot establish direct violation of Decedent's Eight Amendment rights, as (1) Decedent did not face a substantial risk of serious harm; (2) Movants were unaware of the risk, general or particular, that Decedent faced; and (3) Movants took reasonable steps to abate any risk Decedent might have faced. (Docket No. 64 at 6-25.) We address each argument in turn.

First, Movants contest that no substantial risk existed because Río Piedras 352 housed "mostly low risk inmates" and because the "incidences [sic] of violence was minimal" there. (Docket No. 64 at 16.) To support that conclusion, they cite Negrón's testimony

describing the layout of inmates' dormitories. (Id.; Docket Nos. 68 at 2; 68-8 at 5.) Needless to say, Movants utterly fail to support their conclusory statements regarding the risks Decedent faced in their facility. In fact, at least two Movants opined that the conditions there were dangerous and inhumane. (See Docket Nos. 68-8 at 4; 73-20 at 4.) Given the security deficiencies described above, both systemic and particular to the stabbing incident, supra Part I.B, we find that Plaintiffs have submitted sufficient evidence to show that Decedent faced a substantial risk of serious harm during his confinement.

Second, Movants argue that they were unaware of any risk, general or specific, Decedent faced at Río Piedras 352. (Docket No. 64 at 14-15.) To support that argument, they point to evidence that they never received any notice that Decedent was at particular risk of harm. (Id.) But that evidence does not shield Movants from liability; if they had knowledge regarding the general risk to someone in Decedent's circumstances, they can be found liable regardless of whether Decedent faced any particular risk. See Farmer, 511 U.S. at 843-44. And insofar as each actively administered security for Río Piedras 352 in some capacity, we find knowledge regarding general risks there fairly attributable to each. Moreover, Plaintiffs submitted sufficient evidence to show that each Movant did, in fact, possess knowledge, and responsibility, regarding that risk. See sources cited supra note 6; supra Part I.A.

Finally, Movants argue that, given the limited resources and control available to each, all Movants took reasonable steps to abate any risk that existed at Río Piedras 352. (Docket No. 64 at 11-25.) In support, they point to various security measures they took, including fielding inmates' complaints (id. at 15); routine searches (id. at 21); sufficient personnel (id. at 21, 24, 25); general implementation of security policies (id. at 21); and disciplinary proceedings against officers (id. at 23). Further, they explain that certain decisions regarding security at Río Piedras 352 fell outside their control. (Docket No. 64 at 11-25.)

In response, Plaintiffs proffered evidence showing that despite Movants' promulgation and implementation of security policies, basic security measures, such as locking cell doors or guards at all prescribed posts, or even one guard at the solitary post, were, nevertheless, absent at the time of Decedent's death. See supra Part I.B. In view of the role each Movant played in providing such basic security for prisoners at Río Piedras 352, supra Part I.A, the absence of same suffices to support the inference that Movants failed to take reasonable steps to abate the risk that Decedent faced.

We now address briefly the issue of supervisory liability. Movants essentially argue that there is no affirmative link between supervisors' activities and any violations that occurred at the hands of their subordinates. (Docket No. 64 at 20-25.) Plaintiffs, in turn, have submitted evidence showing that each supervisor was charged, to

some extent, with ensuring that subordinates took prescribed measures to secure their prisoners. See supra Part I.A. As such measures were absent, the inference arises that supervisors failed in their duty to adequately train or oversee subordinates, or that their "encouragement, condonation or acquiescence or gross negligence," Pineda, 533 F.3d at 54, otherwise facilitated subordinates' deliberate indifference toward Decedent's safety. We, thus, find no grounds for granting summary judgment on Plaintiffs' supervisory liability claims.

### 2. **Fourteenth Amendment**

The Fourteenth Amendment prohibits the deprivation of a person's life, liberty, or property by a state or territory without due process of law. U.S. Const. amend. XIV, § 1; see Exam'g Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 586 (1976) (applying Due Process Clause to U.S. territories). Nevertheless, "[s]ubstantive due process is an inappropriate avenue of relief when the governmental conduct at issue is covered by a specific constitutional provision." Pagán v. Calderón, 448 F.3d 16, 33 (1st Cir. 2006) (citing County of Sacramento v. Lewis, 523 U.S. 833, 843 (1998); Graham v. Connor, 490 U.S. 386, 395 (1989); S. County Sand & Gravel Co. v. Town of South Kingstown, 160 F.3d 834, 835 (1st Cir. 1998)). "[A]pplication of this prophylactic rule depends only on whether a specific constitutional provision addresses

the type of conduct at issue," not on the probable success of the claim under that provision. Id. Conditions-of-confinement cases, like this one, are properly analyzed under the Eighth Amendment. See, e.g., Farmer, 511 U.S. 825. Thus, Movants are entitled to summary judgment as to Plaintiffs' Fourteenth Amendment claim.

**B.    Qualified Immunity**

Movants argue that they are entitled to qualified immunity because their actions did not violate Decedent's constitutional rights and because the law governing their conduct was not clearly established. (Docket No. 64.)

Qualified immunity protects state officials from the burden of standing trial or facing other onerous aspects of litigation. Saucier v. Katz, 533 U.S. 194, 200 (2001). To determine whether Movants are entitled to qualified immunity, we must ask "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right at issue was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontañes, 568 F.3d 263, 268-69 (1st Cir. 2009) (citing Pearson v. Callahan, 129 S. Ct. 808, 815-16 (2009)). The second prong of the Pearson analysis entails two separate inquiries: First, whether the right at issue was sufficiently clear; and second, whether under the facts of the particular case, a reasonable defendant would have known that his conduct violated that

right. Id. at 269 (citing Brousseau v. Haugen, 543 U.S. 194, 198 (2004); Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

We already determined that Plaintiffs proffered sufficient evidence to establish a violation of Decedent's Eighth Amendment rights, supra Part III.A.1, and accordingly, we find the first prong satisfied. Movants stipulated that the "rights afforded to convicted inmates under the Eighth Amendment are well established" (Docket No. 64 at 30); we agree and find the first inquiry under the second step satisfied as well. As to the final inquiry, we need only note that the AOC received regular analyses as part of an ongoing effort to comply with this court's standing order to remedy certain conditions deemed violative of its prisoners' right to humane conditions of confinement. (See, e.g., Docket Nos. 73-16 at 6-7, 9; 73-22 at 3-4.) Mindful as we are that the Puerto Rico prison system has been the object of litigation and federal court supervision since 1979,[9] no one can seriously argue that qualified immunity is an available defense where the prison system is in shambles, and those who work there assume the risk of being held responsible for situations like the one presented here. Thus, Movants cannot persuade that a reasonable official in their circumstances would have concluded that perpetuating, or exacerbating, those very conditions did not violate Decedent's Eighth Amendment rights. Given the above

---

[9] Morales Feliciano v. Acevedo Vilá, Civ. No. 79-004 (PG).

conclusions, we find that Movants are not entitled to qualified immunity, and we strongly urge the parties to settle this case.

### IV.

### Conclusion

For the reasons stated herein, we **GRANT IN PART** and **DENY IN PART** Movants' motion for summary judgment (Docket No. 64). We **DISMISS** Plaintiffs' Fourteenth Amendment claim, but **RETAIN** all other claims.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 15th day of September, 2009.

s/José Antonio Fusté
JOSE ANTONIO FUSTE
Chief U.S. District Judge